All rise for the plenary session. 3-14-04-34 consolidated with 3-16-03-46 People of the State of Illinois, Appellee by Mark Rostl v. Derek Sweet, Appellant by Dimitri Goltis Good morning, Your Honors. May I please the Court, I'm Dimitri Goltis, I'm from the Office of the State Appellate Defender, and I represent Derek Sweet. Your Honors, this is a consolidated appeal, stemming from the Circuit Court's jurisdiction now of Derek Sweet's post-conviction petition, and also its more recent sui sponte dismissal of his 2-14-01 petition. We've raised three issues in the briefs, however I'll be focusing my argument on our claim in the 2-14-01 appeal, that the trial court not only erred by dismissing the 2-14-01 petition, but also that Mr. Sweet is actually entitled to judgment as a matter of law on his 2-14-01 petition. If time permits, I will also address our claim in the post-conviction appeal, which is that Derek Sweet's post-conviction attorney, Matthew Kwakua, performed unreasonably by failing to properly present Derek Sweet's post-conviction claim, that his guilty plea attorney, Ms. Gail Carver, operated under a concept of interest at the time of the entry of this plea. Certainly, if this court has any questions regarding any of the issues that have been raised, I'll be more than happy to address them. Before I address the merits of the primary issue of the 2-14-01 appeal, I want to briefly discuss the standard review for that issue, because the parties seem to disagree on what that standard review is. The standard review is de novo. What happened in this case was that the Circuit Court issued a judgment on the pleadings in favor of the State, and what our Supreme Court has said, in both Vincent and Cornelius, is that in a 2-14-01 case, when a court issues a judgment on the pleadings, that judgment is reviewed de novo. Certainly, in every other civil context, the judgment on the pleadings is reviewed de novo, and the reason for that is, in order to issue a judgment on the pleadings, there must be no genuine issue of material facts, and a particular party must be entitled to judgment as a matter of law. So what that means is the only question that the Court has resolved when issuing a judgment on the pleadings is a legal question. Legal questions are, of course, reviewed de novo. The State, in its motion to cite additional authority, has cited this Court's recent decision in honoring the marriage of Labuse for a proposition that, in all 2-14-01 cases, the ultimate decision on the petition is reviewed for indecisive discretion. This Court did not say that in Labuse, and furthermore, Labuse is distinguishable because it did not involve a judgment on the pleadings. Turning to the merits of the 2-14-01 petition, this Court improperly relied on our Supreme Court's decision in Peoples v. Picazzli to dismiss the petition. What Picazzli says is that a 2-14-01 petition is not an appropriate avenue to raise a stricken claim. Picazzli does not apply here because Mr. Sweet's 2-14-01 petition did not raise a stricken claim. Instead, it challenged the performance of a post-conviction counsel, which is a statutory claim. Significantly, there was no response to the pleadings filed by the State in this case, and what that means under the rules of SOAR procedure is that the State has necessarily admitted to the well-pleaded factual allegations of Derrick Sweet's 2-14-01 petition. As a result, it has admitted that between the time that Derrick Sweet entered into his open plea of guilty and the time of his sentence, the State has admitted that guilt over sent Derrick Sweet the following letter, and she said in that letter, quote, Remember that Judge Henderson has promised that there will be no life sentence. That makes me believe that he will fashion a sentence that will someday allow you to resume a positive life. The State has also admitted, by failing to respond to the 2-14-01 petition, that Derrick Sweet gave a copy of this letter to his post-conviction attorney, Mr. Kwakula, and urged him on numerous occasions to use that letter during the post-conviction proceedings. The record is clear that Mr. Kwakula did not use the letter during the post-conviction proceedings. Counsel's therapy of that letter was reasonable, and it could not have been a matter of strategy. To be sure, post-conviction counsel Kwakula was presented with a pretty outrageous scenario. In the context of an open plea agreement, judges do not make promises to defendants as to what their sentence will be, and certainly while an attorney should advise their client as to what the sentencing ranges in the context of an open plea, attorneys should not be telling their clients that the judge has made a promise as to what the sentence will be. Nevertheless, that is what Gail Carper told Derrick Sweet in her letter to him. Now, what she said in that letter significantly conflicted with her testimony at the third-stage evidentiary hearing on the post-conviction petition. At that hearing, she denied on more than one occasion that she ever told Derrick Sweet that Judge Henderson made a promise about what his sentence would be. She said, and I quote, that there was no way in the world Judge Henderson would have made that promise to anyone. She denied telling Mr. Sweet that there was a tacit understanding with Judge Henderson regarding the sentence. She said that there was, quote, no way I would tell him that. The letter proves that she did tell him that, and given that she said in the letter she used the words to Derrick, that Judge Henderson has promised, I think we can reasonably infer from her use of the word remember that she had told, or someone had told Mr. Sweet this on occasion prior to her sending him this letter. This letter was evidence that post-conviction counsel could have used at the evidentiary hearing to establish Mr. Sweet's claim that his plea was coarse and that counsel was ineffective. It also could have been used to impeach Gail Carper's testimony. There is no genuine issue of material fact in this case concerning post-conviction counsel's performance, and the question of whether post-conviction counsel provided reasonable assistance is a question of law. It is a question of law that this Court can rule upon. Given the factual allegations the State has made, the factual admissions the State has made, and the record in this case, this Court can conclude as a matter of law that post-conviction counsel performed unreasonably. One more point that I would like to make on this issue, and that's that had the Circuit Court known of the existence of this letter at the time of the evidentiary hearing, it would not have denied the post-conviction petition. That is not to say that it would have granted the petition. That's just to say that the Court would have wanted to hear more testimony about this letter and why these statements are in here. They're outrageous. So, for these reasons, we ask that this Court conclude that Mr. Sweet is entitled to judgment as a matter of law on this 214-1 petition, that you reverse the Circuit Court's judgment, grant the petition, and order a new third-stage evidentiary hearing with the assistance of a new attorney for Mr. Sweet and the appointment of a special prosecutor because post-conviction counsel Kwakula is now the State's attorney at McDonough County. With that said, this Court in the post-conviction appeal could also conclude that Mr. Kwakula performed unreasonably. When Carper moved to withdraw after she had filed a motion to reconsider Derek's sentence, she cited Illinois Rule of Professional Conduct 6.2 as the most important reason for her to withdraw from her representation. What that rule says is that an attorney should not avoid an appointment unless there is good cause, and the good cause that Ms. Carper cited was that when a client or the client's cause is so repugnant to the attorney that it would impair the attorney-client relationship or the attorney's representation of the client to go on with that representation. This was all after he made all those allegations, or she said that, right? It was. It was after she had done, she had represented the defendant, did all these things, and then at this hearing she finds all kinds of pro se motions filed by the defendant where he alleges all kinds of things, right? About her. He alleged that she coerced him into pleading guilty, and I think in those circumstances it certainly. No, no, he says a lot more than that about her representation. And, for example, when she testified at the post-conviction evidentiary hearing, she said that what she read was so offensive to her that she did not want to read it anymore. And, you know, this is to re-read it. And she was very bothered by it, and it had been in the subject of ARDC complaints, and later on in appeals and so forth and so on. But initially when she made the first statement, when she asked to withdraw, this was after all these things that he alleged in his motions, right? That's correct. And what's the normal reaction when normal people do that? The normal reaction for an attorney in that situation would be to say, hey, we need to have a crime court hearing. And I think what she did went beyond that. She's saying that the client or the cause was so repugnant to her that she could no longer continue with her representation. But look at the context of what she said. It wasn't that it was because of these letters, not because of something else that was so repugnant. I don't think we know that, Your Honor. Take it in the context of the case. We don't know that. And when she testified at the evidentiary hearing that she was reading the record and that she stopped because she found it so offensive, that answer was not in response to the question, why did you find Mr. Sweet repugnant? Why did you withdraw? That answer was in response to, did you read the record in preparation for coming to the evidentiary hearing? Now, at the end of the day, Mr. Sweet has alleged in his petition that she had this view from the beginning of her representation. And there's nothing in the record that contradicts that. Now, what Your Honor says, where you're going with that, could potentially be correct that she didn't find him repugnant until the time he filed these post-trial motions. But we need an evidentiary hearing to flesh that out. We don't know that. At the end of the day, we have the allegation from Mr. Sweet in the petition and the record is not contradicting. Well, didn't she say in her motion that the defendant's post-trial motions contained false allegations regarding her representation and that would violate several rules of professional conduct, including the ruling that we're referring to about being repugnant. And on the hearing to withdraw, she indicated that she came on the day of the hearing to reconsider the sentence. She was informed that he had filed those post-trial motions. She further indicated that the bulk of the defendant's allegations in the post-trial motions pertained to her representation of the defendant. She stated, because I consider those allegations in these motions to be false, I feel that it would be requiring me to violate a number of rules. That's a direct statement about because of those allegations. That's what she's referring to. It wasn't the underlying charges of the representation before. It was after the post-trial motions were filed. She is citing a rule, Rule 6.2, that regards accepting an appointment, not withdrawing in the middle of the case. And I think... She cited a rule that talked about if you find something repugnant, that you can't really represent the person. And there came a point in time, because of the post-trial motions, that really bothered her, right? That could be one reason why she was bothered, correct. But again... You read the post-trial motions. I did. Did you think that might bother someone who's a representative? Of course it could bother someone, yes. But again, that's not contradictory to this claim that she felt this way from the beginning of the representation. Let me ask you this. Can a criminal defense lawyer find his or her client repugnant, and find their crime repugnant, and still give them adequate representation or excellent representation? I think an attorney could view their client or cause as repugnant in a way that they should not take that case. But if they could take that case, they could do a good job. Well, let me ask you this. What percentage of criminal defense lawyers out there do you think don't find killing kids repugnant? I have no idea. I mean, I suspect in the real world that many of these lawyers find that the crime, the person, the action is repugnant, and yet still recognize their duty under the law to provide them with an adequate representation. So the personal feeling that your client is repugnant and some of these horrific crimes, how could they not find them repugnant, and yet still do their job as a lawyer to provide them a good defense? So I think some lawyers' personal feelings that his client is a really bad person is probably a common feeling in the real world, and yet these lawyers do what they have to do, put that aside, and represent them. Certainly, but there's a difference between merely not liking your client, thinking the client is a horrible person, versus viewing that client with such a degree of repugnancy that it will impair your ability to represent that person. Well, and this lawyer said that when she got to that point, at that point when she got to that point, she asked to withdraw. She said, well, I can no longer do it. How does that create a conflict before that time? We don't know. All that we know is she cited a rule that pertains not from withdrawing from a representation once you've already accepted it, once you've already been appointed, but from not accepting that appointment, period. And Derek Sweet alleged in his petition that she felt that way about him from the beginning. That's what he alleged, but that's not what she said at the hearing. At the event hearing? She said the allegations against her were so offensive, and they were lies, and they attacked her personally. And again, Your Honor, that answer that? That's when she said, further representation, it violates that she threw that rule in about, you know, it's so reflective I can't go on. In the context of this, doesn't she just return to after she did all this work and after she did the things she's alleged she's done and accuses in the hearing the defendant of multiple lies, then she says that she gets this stuff, and now one of the rules that she feels would be applicable is the rule about you find something so repugnant you can't represent somebody. And that was the junction. In the context of when these things were filed, there's a timeline, isn't there? Your Honor, all I can say is, again, at the evidentiary hearing, when she testified that she read the record and she found all these lies and they were offensive to her, that response was in response to the question, did you read the record before coming to court today at this evidentiary hearing? That was not in response to a question, when did this repugnancy arise? Why did you feel this way? And that is a question that needs to be asked. Counsel, that's two minutes. And, again, ultimately, there is an allegation in this petition alleging a conflict of interest. And we believe that that allegation is not rebutted by the record. And, frankly, neither did post-conviction counsel. He didn't withdraw it from the petition. He went to the first state evidentiary hearing with that claim in the petition. He did not amend the defective affidavit, which the state in its brief admits that it was a problem that counsel had a duty to correct. He also didn't question Gail Carper or Derek Sweet about this claim of repugnancy and of a conflict of interest. Under this Court's decision in Ross, that is unreasonable assistance, regardless of whether or not we can establish at this point the merits of the underlying claim of a conflict of interest. Harmlessness does not come into play here under this Court's decision in Ross  A remand is required for a new evidentiary hearing with the new attorney. Unless Your Honor has any further questions, we would ask that this Court reverse this very Court's judgment on the post-conviction petition as well and remand for further proceedings with, again, a new counsel and a special prosecutor. Thank you. Thank you, counsel. Counsel. Good morning, Your Honor. May it please the Court. Counsel. In his A argument in his main brief, the defendant argued that his post-conviction petition alleged made a substantial showing that his trial counsel, Gail Carper, had a per se conflict of interest when he pled guilty to the first degree murder of his paramour's 16-month-old child. Regarding a per se conflict of interest, the threshold inquiry is whether counsel represented or represents a party conflicting interests to those of their client. In his petition on appeal, the defendant has not claimed that Ms. Carper represented a party with conflicting interests. In his brief, the defendant quoted the case in which our Supreme Court stated that a per se conflict exists where defense counsel has a tie to a person or entity, either counsel's client, employer, or own previous commitments, which would benefit from an unfavorable verdict for the defendant. The defendant has not argued or shown that Ms. Carper had a tie to any interest that would benefit from an unfavorable verdict in this case. The Supreme Court also stated that a per se conflict would exist if defense counsel had a prior or contemporary association with either the prosecution of the victim. Ms. Carper did not have such associations and the defendant has not alleged that she did. Therefore, the defendant cannot show that Ms. Carper had a per se conflict of interest. At the evidentiary hearing, the defendant testified that he filed a post-conviction petition alleging that Ms. Carper was ineffective and that his main claim was that Ms. Carper coerced him into pleading guilty. In his testimony, the defendant did not allege or imply that Carper had a conflict of interest. In 2003, Ms. Carper filed a motion to withdraw. That was after the defendant filed an ARDC complaint against her. After the defendant later filed two pro se post-conviction petitions alleging Carper was ineffective and that she coerced him into pleading guilty. In her motion to withdraw, Carper stated that she considered the defendant's allegations to be false and that to continue her representation of the defendant would violate three rules of professional conduct, 1.16, 2.1, and 6.2. On appeal, the defendant only argues that Ms. Carper's reliance on 6.2c shows that she had a per se conflict of interest. Rule 6.2c contains the language, the client or the cause is so repugnant to the lawyer as to be likely to impair the client-lawyer relationship or the lawyer's ability to represent the client. Rule 6.2c discusses repugnance in the context of a lawyer trying to withdraw from representation in the first place before they're even appointed. Not to withdraw, not to accept the appointment. Correct, not to accept the appointment. But when she withdrew, Ms. Carper had no other rule to rely on regarding withdrawal after appointment on the ground that the defendant's behavior had become repugnant to her after sentencing and after what he made which she believed were false claims against him. Effective January of 2010, seven years after Carper filed her motion, Rule 1.16b-4 was revised to state the lawyer may withdraw from existing representation if the client insists upon taking action that the lawyer considers repugnant or with which the lawyer has a fundamental disagreement. Rule 1.16 did not list repugnance as a reason to withdraw prior to 2010. Only Rule 6.2 contained the term repugnant. The record shows that Ms. Carper diligently and competently represented the defendant at all times during this case. The evidence against the defendant was overwhelming. The defendant confessed to bending the 16-month-old victim backward until it heard a pop. He told the police that he broke her and there was no one else that could have committed this crime. At the evidentiary hearing on the defendant's post-conviction petition, Ms. Carper testified that she'd read parts of the court file prior to that hearing and she described the offensive material in the file as the lies and accusations that the defendant raised about her personally. Post-conviction counsel did not question the defendant or Carper about any conflict, which has been alleged in this appeal for the first time. The trial judge found that the defendant was not credible, that Carper was credible, that the defendant was not coerced into pleading guilty, and the defendant had not penned his burden to show that Carper had been ineffective. Thus, the record shows that Ms. Carper did not have a conflict of interest and that she was not ineffective. In his B argument, in his main brief, the defendant argued that his post-conviction counsel did not provide reasonable assistance or counsel failed to present any evidence that Ms. Carper had a per se conflict of interest. The defendant did not allege in his post-conviction petition that she did have a conflict of interest. In his petition, he repeatedly and consistently alleged throughout that Carper had been ineffective and coerced him into pleading guilty. Therefore, post-conviction counsel cannot have provided unreasonable assistance by not arguing at the evidentiary hearing an issue the defendant did not raise and that has no support in the record. Supreme Court Rule 651C does not require post-conviction counsel at a third stage evidentiary hearing to argue or present evidence on all the contentions raised in a defendant's petition or as in this case, to present argument on an issue that was not even raised in the petition. Our Supreme Court in Greer stated that fulfillment of Rule 651C obligations to make amendments to the petition does not require post-conviction counsel to advance frivolous or spurious claims on the defendant's behalf. In his petition, the defendant noted that his prior trial counsel had been allowed to withdraw due to stated conflict of interest, but the defendant did not then allege that Ms. Carper had a conflict of interest. In the post-conviction counsel's clear strategy, which is outlined in his response to the people's motion to dismiss, was to attack the defendant's guilty plea and conviction based on the defendant's stated allegations of ineffective assistance and that Carper had coerced him into accepting the guilty plea. In his main brief, the defendant noted that in his petition he alleged that Carper had a bias against him and that Carper's disposition toward him affected her judgment and decision-making in this case. Of course, judgment and decision-making go to effectiveness. They are not conflict of interest issues. In his post-conviction petition, the defendant specifically references Ms. Carper's motion to withdraw as supported by his allegation that Carper was biased against him and due to this alleged bias, she had been ineffective. The defendant did not raise a claim that Carper was biased until after the defendant had filed the ARDC complaint and his pro se post-trial motions and after Carper then filed her motion to withdraw. In her motion to withdraw, Carper stated that his allegations were false allegations concerning her representation. The defendant's allegation in his petition that Ms. Carper had been biased against him from the beginning of her presentation is based solely on the language of the rules Carper attached in support of her motion to withdraw. Therefore, the defendant's claim of bias in his post-conviction petition is a red herring and is without merit. Contrary to the defendant's assertion, in his reply to Ms. Carper's petition, why Carper decided to withdraw is actually central to this appeal. Obviously, had the defendant raised an allegation that Carper had a conflict of interest, the post-conviction judge would have discussed what is clearly a fundamental allegation. The post-conviction judge did not mention such an allegation as ordered denying the defendant's position and in the hearing, the judge did not mention or make any statement to the effect that the defendant had even implied that Carper had a conflict. In his main brief, the defendant also raised an issue asserting his post-conviction counsel provided unreasonable assistance or counsel did not assure the defendant's supporting affidavit was properly notarized and filed. The people did not contest this affidavit below and we cannot do it on appeal. We have forfeited that issue and though counsel failed to assure that there was a proper affidavit attached to the defendant's petition, an evidentiary hearing was still held on the petition and counsel gave reasonable assistance by arguing and providing testimonial evidence on the specific claims that the defendant raised in his petition. In his supplemental brief, in his A argument, the defendant argued that the trial judge erred in dismissing his 214-1 petition on the basis that pursuant to Pink-Consley, a claim of ineffective assistance cannot be raised in the 214-1 petition. The Pink-Consley court clearly stated, quote, we have long held that section 214-1 proceedings are not an appropriate forum for ineffective assistance claims because such claims do not challenge the factual basis for the judgment, end quote. The defendant asserts on appeal that he raised a claim of unreasonable assistance of post-conviction counsel in a 214-1 petition. The defendant asserts on appeal that he raised a claim of, I'm sorry, in his supplemental reply brief, the defendant states, how could the Pink-Consley court decide whether a claim of unreasonable assistance of post-conviction counsel may be raised in a 214-1 petition? The answer is simple. It couldn't have and it didn't. But in the next paragraph, the defendant states that Pink-Consley entertained a claim with respect to 214-1 counsel, holding that the defendant did not receive unreasonable assistance from 214-1 counsel. The Pink-Consley court's two sentence statement indicating that Pink-Consley's counsel on his 214-1 petition did not provide unreasonable assistance was dicta. Since it was not necessary to the decision and as the defendant notes in the supplemental reply brief, no issue regarding unreasonable assistance was raised in that state appeal. What's the difference between ineffective assistance and unreasonable assistance? Ineffective assistance is a constitutional issue. Unreasonable assistance is by statute. And you can raise ineffective assistance on appeal, you can raise it on post-conviction. That's where you can raise it and the structural basis for it. Factually, what's the difference in the elements between ineffective assistance and... Virtually the same, really. That's what I'm asking is what factually is. You've got two different bases for bringing the action. Factually, what would you bring in one that you wouldn't bring in the other or vice versa? Essentially, the two can be considered as about the same type of action. If you consider the Strickland factors, they can be applied to an unreasonable assistance claim also. But the standard, I believe, is a little lower for unreasonable assistance than it would be for ineffective assistance, generally speaking. Again, I'm not asking about the structural aspects of how you bring it. I'm asking what facts would show one and what facts would show the other. In the facts that you would attempt to raise? Generally, in an effective assistance, you would have to show that his trial was tainted somehow. Whereas in an unreasonable assistance, you're of course saying that the counsel did not amend a petition properly or did not raise arguments on a post-conviction petition properly to present the constitutional claims. There are different avenues to claim that the counsel was not effective. Counsel has two minutes. Thank you. I don't know if I've answered your question adequately. The Pink-Consolidated Court also stated that facts exist that were unknown to the court at the time of trial and would have prevented entry of the judgment. A claim of unreasonable assistance of post-conviction counsel does not fall under that definition. The defendant also cited Lawton to support a claim of unreasonable assistance. Peace counsel cannot be raised in a 214-01 petition, but Lawton explained that Section 214-01 is an appropriate avenue to raise claims of ineffective assistance in civil proceedings under the Sexually Dangerous Persons Act where the respondent had the same counsel at trial and on appeal because such persons cannot obtain relief under the Post-Conviction Hearing Act. Unlike in Lawton, the defendant did have two different attorneys at trial and on appeal and he had an evidentiary hearing on his post-conviction petition. Lawton did not expand the use of the 214-01 petition to bring claims of ineffective assistance in all cases, but it expanded that use in that very limited circumstance and that's not present here. Lawton did not overrule Pink-Consolidated. In this case, the defendant's claim of unreasonable assistance has been raised in appeal and a record is sufficient for the court to review this claim. The record contains the letter allegedly received from Ms. Carper. There is no record that it was admitted into evidence or discussed at the evidentiary hearing below and the defendant did not inform the trial judge of the existence of the letter. Both the defendant and Carper testified at the evidentiary hearing about whether Carper told the defendant that there was a sentence agreement which the defendant claimed was supported by a letter. The defendant testified that Carper told him he would receive a 20-year sentence, but the letter states that the trial judge promised Carper that the defendant would not receive a life sentence. The defendant was sentenced to 50 years, which is not a life sentence. He would be able to get out at age 77, as I recall, and it's not even the maximum 100-year sentence that he could have received, which of course would have been a life sentence. Even assuming that he's... I suppose you could take... You could take the life expectancy tables, which were not discussed in this case anywhere, and I suppose you could use life expectancy tables to come up with an average life span for people, but of course many people live into their 80s, 90s, and even a few get into their 100s, and some people die in their 40s, 50s, 60s. It's just not unreasonable to believe that someone would... I have not seen a table for prisoners, Your Honor. I do know that some prisoners, in my experience... I'm sorry? I've seen instances where individuals are in prison in their 80s and are released in their 80s, and I know that it's possible to live a long life even in prison. He's a child murderer. He may not have that opportunity. That's unfortunate, but some child murderers do get attacked in prison. I'm just wondering if there was a standard... I am unaware of an objective standard regarding a prisoner's life expectancy. Counsel's time. We just ask that you affirm the decision below. With respect to Peoples v. Pecansley, a post-conviction petition was never filed in Pecansley. So the court in Pecansley could not have said that a 214-1 petition is inappropriate to challenge post-conviction counsel's performance. There was no other place for Derek Sweet to challenge post-conviction counsel's performance other than a 214-1 petition. You can't raise it in a successive PC because it's not a constitutional claim. You couldn't raise it on the appeal from a post-conviction because the letter isn't part of the record. Also, we don't know whether the post-conviction counsel had a copy of the letter. Those are a new factual allegation that isn't part of the record. Certainly, the language of Section 214-1 is broad enough to encompass such a claim. 214-1 reads that, and I'm quoting, In Peoples v. Lawton, our Supreme Court recognized that this is broad language. And what they said in Lawton, even though they weren't addressing a claim that post-conviction counsel performed unreasonably in a 214-1, what they were saying was that when there is no other avenue to challenge counsel's performance, when it can't be done in a direct appeal or in a post-conviction petition or an appeal from a post-conviction petition, when the 214-1 petition is the only remedy that's available, justice requires that that claim be made, allows to be made in the 214-1 petition. And I think that principle, even though they were dealing with the Sexually Endangered Persons Act, is equally applicable here. Under these circumstances, do you have to show any prejudice on this unreasonable claim? No. The Supreme Court has said so in Peoples v. Suarez. You don't have to show that the error was harmful, that there was prejudice. You just have to show that counsel didn't comply with his duties. And the duties go beyond the 651 duties. I mean, those duties concern what happens at the second stage, amendment of the petition. But certainly, counsel has duties at the third stage. You can't just, once you get to the third stage of your hearing, you just drop the ball, you don't represent the client, you have to present the client's claim to the court. And this court said so in Ross. Part of this court's reasoning in Ross was that counsel didn't elicit evidence, didn't question the witnesses to present evidence of the claim. And this court in Ross wasn't concerned with whether the underlying claim was meritorious. This court remanded anyways, saying that counsel performed unreasonably. So no, you don't have to show prejudice. You know, this letter that you make a lot of inferences about, stated that, remember that Judge Henderson has promised that there will be no life sentence. That makes me believe that he will fashion a sentence that will someday allow you to resume a positive life. Now, what inferences, or what does that prove in your mind, in your argument about the defendant's claims? The defendant has claimed in his 214.1 petition that post-conviction counsel performed unreasonably. He's claimed that had the judge known of this letter at the evidentiary hearing, he wouldn't have denied the PC in the way that he did. And what the letter shows, I mean, at the evidentiary hearing, Gail Carper on more than one occasion denied ever telling Derek Sweet that the judge made a promise regarding his sentence. She said that in many different ways. She was adamant about that. But this letter shows that she did tell Derek Sweet that the judge made a promise. Now, regardless of whether Judge Henderson actually made that promise, at this stage is beside the point. What matters is that she denied it at the evidentiary hearing, but we have a letter that shows that she did say it. And there's a consequence. Now, at the hearings, he alleged that he claims that she said that he wouldn't give a particular sentence, correct? That's true. And what was that particular sentence? 20 years. This letter doesn't talk about 20 years? It doesn't. And it doesn't have to for us to propel his appeal. Derek Sweet also testified at the evidentiary hearing that the judge promised not to give the malice sentence, that he was told that, regardless of what his sentence actually is. That may be relevant to whether he ultimately prevails, whether he ultimately should be allowed to withdraw the plea. But at this stage, all we're concerned with is whether the post-conviction counsel performed unreasonably. The post-conviction counsel was at the evidentiary hearing asking Gail Carper questions, and the answers that he got was, I never told Derek Sweet that the judge made a promise to him about his sentence. He knows of this letter, and that letter clearly says, remember that Judge Henderson has promised that there will be no life sentence. That contradicts your testimony. That's all we need to win this appeal. Counsel should have used this letter. He could have used it to establish a claim that Derek Sweet's plea was coerced, and he could have used it to impeach Gail Carper. That's pretty significant when you have an attorney telling the client that a judge has made a promise as to what his sentence is going to be in the context of an open plea. Justice Litton, getting back to your inquiry about life expectancy, I cited in my reply brief, People v. Sanders, where the appellate court delivers the first district sentence of the life expectancy of a prisoner held in general prison population is 64 years. They were relying on life expectancy tables for that. I'm not pulling it out of thin air. I'm sure we can rely on case law from this state for that principle. Thank you, counsel. Thank you both. The court takes this under advisement. We'll now take a short recess.